## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy Case No. 15 B 35985 |
| | ) | |
| ROBERT J. FERRARI, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| | ) | |
| DAVID R. BROWN, not individually but as chapter 7 trustee for the bankruptcy estate of ROBERT J. FERRARI, | ) ) ) | Adversary Case No. 17 A 00192 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT J. FERRARI, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the Court on the adversary complaint filed against Robert J. Ferrari (the "Debtor) by plaintiff David R. Brown, not individually but as the chapter 7 trustee for the Debtor's bankruptcy estate (the "Trustee"). The Trustee objects to the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(3), and (a)(5) of the Bankruptcy Code.[1] For the reasons outlined below, the Court finds in favor of the Trustee and against the Debtor on Counts II and III of the complaint and holds that the Debtor is not entitled to a discharge under §§ 727(a)(3) and (a)(5). As for Count I, the Court finds that the Trustee has failed to meet his burden under § 727(a)(2)(A). As such, that count will be dismissed.

---

[1] Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532.

1

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

## BACKGROUND

The Debtor originally filed his bankruptcy case under chapter 13 of the Bankruptcy Code on October 22, 2015 (the "Petition Date"). (Pretrial Stmt. ¶ 4.[2]) The case was involuntarily converted to chapter 7 on the motion of FirstMerit Bank, N.A. ("FirstMerit Bank") on October 17, 2016. (*Id.*; Bankr. Dkt. 127.[3])

The Debtor is a licensed real estate broker and the president and sole shareholder of Best Seats Available, Inc. ("Best Seats"), a ticket broker. (Pretrial Stmt. ¶¶ 7 & 8.) The Debtor owns a home located at 810 Brentwood Drive in Bensenville, Illinois (the "Home"). (*Id.* ¶ 6.) The Trustee alleges that the Home is the Debtor's most valuable asset and that, on the Petition Date, it was worth between $300,000 and $500,000. (Pretrial Stmt., Trustee's Claims, at 1 ¶ 1.) The Debtor obtained an appraisal of the Home in November 2015 which reflected a value of $330,000. (Pretrial Stmt. ¶ 30.)

On the Petition Date, the Home was encumbered by a purchase money mortgage which is currently held by JPMorgan Chase Bank ("Chase Bank"). (*Id.* ¶ 21.) The Debtor's amended schedule D shows the amount owed on the first mortgage as $148,119.85. (*Id.* ¶ 28; Bankr. Dkt. 45.) On the Petition Date, the Home was also encumbered by a junior mortgage allegedly securing

---

[2] Unless otherwise noted, all references to "Pretrial Stmt. ¶ ___" are to the Statement of Stipulated Facts contained in the Joint Pretrial Statement, as amended, filed in this adversary proceeding, No. 17-00192, on December 30, 2017 at Docket No. 35.

[3] Unless otherwise noted, all references to "Bankr. Dkt. ___" are to the bankruptcy court docket in the Debtor's chapter 7 bankruptcy case, No. 15-35985.

an equity line of credit in the amount of $375,000. (Pretrial Stmt. ¶ 33; Trustee Exs. 7 & 8.[4]) The junior mortgage was the subject of a separate adversary proceeding brought by the Trustee under §§ 506(a)(1), 547, and 548. (Adv. No. 16-00757.) That case was dismissed in December 2017 after the Trustee agreed to accept $110,000 for the purchase of the estate's interest in the Home. (*Id.* at Adv. Dkt. 38; *see also* Bankr. Dkt. 166 & 170.) The circumstances surrounding the junior mortgage, and related matters, however, are relevant to this adversary proceeding.

In order to understand the issues before the Court here, some history is required. On February 11, 2005, Stave Properties, Inc. ("Stave"), an Illinois corporation owned by the Debtor and an individual named Joseph Betancourt ("Betancourt"), executed a note and a mortgage in favor of Mount Prospect National Bank ("Mount Prospect Bank") on the property commonly known as 2170-2174 North Stave Street in Chicago (the "Stave Note"). (Pretrial Stmt. ¶¶ 12 & 13.) On the same day, the Debtor executed in favor of Mount Prospect Bank both a guaranty of the Stave Note and a second mortgage on his Home to secure his guaranty of the Stave Note (the "Stave 2nd Mortgage"). (*Id.* ¶ 14.) The Stave guaranty was also secured by a mortgage on Betancourt's home. (Tr. 133:22-134:1.[5]) FirstMerit Bank is the successor-in-interest to Mount Prospect Bank as to both the Stave Note and the Stave 2nd Mortgage. (Pretrial Stmt. ¶ 15.)

On April 17, 2015, FirstMerit Bank obtained a judgment against Stave, the Debtor, and Betancourt on the Stave Note and guarantees in the amount of $246,772.95. (*Id.* ¶ 16.) Thereafter, the Debtor and Betancourt satisfied the judgment, with Betancourt paying approximately $220,000 and the Debtor paying about $24,000 to FirstMerit Bank. (Tr. 134:1-6.) As a result of those

---

[4] Unless otherwise noted, all references to "Trustee Ex. ___" and "Debtor Ex. ___" are to the exhibits admitted into evidence at the trial in this matter which took place on January 9 and 17, 2018.

[5] Unless otherwise noted, all references to "Tr. ___:___" are to the transcript of proceedings of the trial which took place in this matter on January 9 and 17, 2018.

3

payments, a Notice of Satisfaction of Judgment was filed by FirstMerit Bank on April 21, 2015 (Trustee Ex. 13), and on May 4, 2015, a Release of Mortgage as to the Stave 2nd Mortgage was recorded with the DuPage County Recorder's Office (Pretrial Stmt. ¶¶ 17 & 18; Trustee Ex. 14). Thus, as of April 21, 2015, the Debtor's Home was encumbered by only the Chase Bank mortgage, and the Debtor had approximately $182,000 of equity in the Home (using the appraisal figure provided by the Debtor). (Pretrial Stmt. ¶¶ 22 & 28.)

At all times relevant, the Debtor, along with his daughter Maria Ferrari ("Maria"), had another obligation owing to FirstMerit Bank. According to the Debtor, that obligation was in the amount of approximately $300,000 and was secured by a mortgage on a single-family lot located on Cortland Street in Chicago. (Tr. 130:6-25.) The Debtor testified that the property securing the debt was ultimately sold and that a deficiency of approximately $80,000 remained owing to FirstMerit Bank. (Tr. 131:22-132:8.) The Debtor further testified that he tried to work with FirstMerit Bank to resolve the Cortland obligation but was unsuccessful in doing so. (Tr. 130:4-133:5.)

The amended proof of claim filed by FirstMerit Bank in the Debtor's case conflicts with the Debtor's testimony.[6] According to that proof of claim, filed on February 5, 2018 and identified as No. 5-2, FirstMerit Bank alleges an unsecured claim in the amount of $248,100.77. (Bankr. Dkt., Claims Register, Claim 5-2 at 1-3.) The attachments to the proof of claim indicate that the obligation arose from a promissory note executed by 2425 W. Cortland Properties, Inc., a company of which the Debtor served as president and Maria as secretary. (*Id.* at 26-28.) The note was dated April 30, 2010 in the original principal amount of $312,062.74 and was secured by a mortgage on

---

[6] The Court notes that the parties did not submit FirstMerit Bank's proof of claim as an exhibit at trial. However, in taking judicial notice of the docket in the bankruptcy case, the Court examined the claim to better understand the testimony about the obligation.

4

the Cortland Street property, as well as property located in Lombard, Illinois, owned solely by Maria and her husband Juan Salgado. (*Id.* at 26-30.) The indebtedness was further secured by a commercial guaranty executed by the Debtor and a personal guaranty executed by Maria. (*Id.* at 31.)

FirstMerit Bank ultimately obtained an Order Appointing Selling Officer and Judgment of Foreclosure and Sale with respect to the note, mortgage, and guarantees. (*Id.* at 5-12.) That order, dated October 26, 2015, provides that the total judgment amount owing was $248,100.77, of which $89,093.45 was principal, $33,435.16 accrued interest as of October 19, 2015, and $125,572.16 attorney's fees and costs as of October 14, 2015. (*Id.*)

On July 2, 2015, the Debtor executed a number of documents, including the following:

(i) Mortgage and Security Agreement apparently in favor of Nationwide Mortgage and Realty LLC ("Nationwide") to secure an open-end revolving home equity line of credit and future advances, with a credit limit of $375,000 (Pretrial Stmt. ¶ 33; Trustee Ex. 8);

(ii) Mortgage and Security Agreement in favor of Michael Auriemma (identified *infra*), identical to the document executed in favor of Nationwide except that the name of the lender was handwritten in as Auriemma (Trustee Ex. 7);

(iii) Balloon Home Equity Line of Credit Agreement and Disclosure Statement in favor of Nationwide as lender (Trustee Ex. 9);

(iv) Balloon Home Equity Line of Credit Agreement and Disclosure Statement, identical to Trustee Exhibit 9 but undated (Pretrial Stmt. ¶ 37; Trustee Ex. 10).

The mortgages reflected a credit limit of $375,000 and maturity dates of July 2, 2020; the Nationwide mortgage had a balloon-payment rider attached to it. (Pretrial Stmt. ¶ 34, Trustee Exs. 7 & 8.) Both mortgages state that the "Mortgagee secures advances so made, regardless of whether the monies are advanced or applied within 18 months of recording this Security Instrument." (Pretrial Stmt. ¶ 35; Trustee Exs. 7 & 8 at ¶ 26.)

5

The testimony and documents at trial paint a very confusing picture as to who made the various loans that the Debtor allegedly obtained and to whom any obligations were owed. The Debtor testified that the loans were all made to him by his long-time friend and neighbor Michael Auriemma ("Auriemma"), who is the owner and manager of Nationwide, a mortgage broker. (Tr. 40:24-41:4, 47:3-9.) The Debtor admitted that his signature appeared on the various mortgage documents but said that he was confused by and had no explanation as to why he had apparently executed identical documents in favor of both Nationwide and Auriemma. (Tr. 44:2-17, 47-58.)

The Debtor did not receive $375,000 when he executed the mortgages or the other documents described herein or at any time before or after their execution. (Tr. 186:13-187:17.) Instead, the Debtor testified that the junior mortgage(s) and related documents were executed to secure previous and otherwise unsecured loans that he had received from Auriemma over a three-year period, beginning in 2012, in the total amount of $240,000. (Tr. 58:17-72:17, 138:8-148:15, 187:12-22, 192:17-22.) Of that, the Debtor testified, $202,000 were cash loans, and $38,000 was for an interest reserve. (Tr. 58:17-72:17, 74:1-6, 192:17-22.)

The Debtor had no receipts for the money allegedly loaned to him by Auriemma, nor did he execute any promissory notes in favor of Auriemma for any of the loans. (Tr. 74:8-75:21.) The Debtor testified that the loans consisted of the following:

(i) $50,000 loaned from Auriemma in 2012 so that the Debtor could remodel a hot dog stand that he owned. (Tr. 59:10-25, 140:4-24.) According to the Debtor, the loan from Auriemma was given to him in cash, in a briefcase, in fifty- and one-hundred-dollar bills, which the Debtor put into a personal safe in his Home and which he then used as needed to pay the contractors for the work done on the hot dog stand. (Tr. 60:4-61:18.) The Debtor admitted that he had no documents evidencing either the receipt of the $50,000 or the disbursement of the cash to pay for the hot dog stand remodel. (Tr. 59:8-61:18.)

(ii) $50,000 in cash loaned from Auriemma to the Debtor in 2013 to purchase a 2010 Mercedes Benz. (Tr. 61:19-62:19, 141:2-9.) The Debtor produced a certificate of title for the car, issued on September 30, 2013, which shows him as the title

6

      holder and Auriemma as the first lienholder. (Tr. 141:17-142:3; Trustee Ex. 12.) The Debtor did not produce a bill of sale or a receipt for the car. (Tr. 66:19-23.) Nor did he produce any documents evidencing the receipt of the $50,000 from Auriemma or the payment to the seller for the car. The Debtor testified that the purchase price of the car was $35,000. (Tr. 66:3-7.) He did not testify as to what he did with the remaining $15,000 except to say that he did not return the difference to Auriemma. (Tr. 66:8-18.)

(iii)    $40,000 in cash loaned from Auriemma in 2014, $25,000 of which the Debtor gave to his attorneys to pay their fees and the rest of which he used to pay real estate taxes, his previous attorneys, business operating expenses, and other bills. (Tr. 67:15-25, 142:7-143:22.) The Debtor produced no documents showing either the receipt of the $40,000 or the disbursement of the cash, nor did he provide attorney's fee bills, receipts, or checks, despite his testimony that he paid his attorneys partially by check and partially by credit card. (Tr. 68:11-70:13, 143:18-19.)

(iv)    $12,000 in cash loaned from Auriemma in 2014 and wired from an MB Financial account to the Debtor's attorneys on October 2, 2014 for payment to a title company in order to close on a condominium sale in connection with the Stave development. (Tr. 70:14-71:9, 144:5-19.) The Debtor produced a copy of the wire transfer from the MB Financial account to his attorneys Brown Udell Pomerantz & Delrahim showing that the transfer took place. (Trustee Ex. 11.)

(v)    $50,000 in cash on or about July 2, 2015 when the Debtor executed the junior mortgage on his Home. (Tr. 71:10-20, 145:3-9.) The Debtor testified that he used the money to purchase tickets to resell through Best Seats and to pay for some business expenses. (Tr. 71:22-72:17, 164:18-24, 187:16-188:23). The Debtor provided no documents evidencing either the receipt of the $50,000 in cash or its use by Best Seats or otherwise.

Less than four months after the July 2, 2015 transaction(s) occurred, the Debtor filed his voluntary petition for bankruptcy relief. The Trustee subsequently filed two adversary complaints, one against Auriemma and Chase Bank on December 27, 2016, which, as discussed above, was ultimately resolved and dismissed, and the current complaint against the Debtor on April 12, 2017. After the Debtor filed his amended answer, the case proceeded to trial on January 9 and 17, 2018, and the matter was then taken under advisement. Having reviewed all of the evidence admitted at trial, the transcript of the proceedings, the arguments of the parties, and the applicable law, the Court is now ready to rule.

## DISCUSSION

Section 727(a) denies a discharge to a debtor who has been unscrupulous in various ways. The bankruptcy system is designed to help the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (internal quotation omitted). Consequently, no discharge is available to the debtor who has been "less than honest." *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). Although the denial of a discharge is a "drastic" remedy, *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002), *aff'd*, No. 02 C 9451, 2003 WL 403138 (N.D. Ill. Feb. 20, 2003), discharge in bankruptcy is a privilege, not a right, *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966 (7th Cir. 1999). A debtor who has not been honest and forthcoming–particularly in connection with the bankruptcy itself–does not deserve that privilege. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

In this adversary proceeding, the Trustee alleges that the Debtor should be denied a discharge pursuant to §§ 727(a)(2)(A), (a)(3), and (a)(5). For the reasons stated below, the Court agrees that the Debtor's discharge should be denied under §§ 727(a)(3) and (a)(5) and thus finds in favor of the Trustee and against the Debtor on Counts II and III of the complaint. The Court further finds that the Trustee has not sustained his burden for denial of the Debtor's discharge under § 727(a)(2)(A), and, therefore, Count I will be dismissed.

### Section 727(a)(3)

The obligation to keep and preserve records reflecting a debtor's financial condition is imposed by § 727(a)(3), which requires a denial of discharge if a debtor "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the

circumstances of the case[.]" 11 U.S.C. § 727(a)(3). Intent to defraud is not an element under the statutory provision. *See Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 896-97 (Bankr. N.D. Ill. 2003).

Section 727(a)(3) ensures that a debtor will provide "enough information to ascertain [his] financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 899 (7th Cir. 2002) (internal quotation omitted). Accordingly, a debtor must maintain, preserve, and produce records of his financial affairs. *Id.* Although records need not be kept in any particular manner, they must be sufficient to provide "a true presentation of the debtor's financial affairs." *Schechter v. Hansen (In re Hansen)*, 325 B.R. 746, 761 (Bankr. N.D. Ill. 2005) (internal quotation omitted). Neither the Court nor creditors have an obligation to "reconstruct a debtor's financial situation," *Union Planters Bank*, 283 F.3d at 899, nor are they required, "in the absence of adequate records, to take a debtor's word for his financial dealings," *Hansen*, 325 B.R. at 761.

Here, the Trustee has the initial burden of establishing inadequacy of the Debtor's records. *See Costello*, 299 B.R. at 897. Adequacy is determined on a case-by-case basis. *Hansen*, 325 B.R. at 761-62. Among the factors that a court should consider are the size, complexity, and nature of the debtor's business; the debtor's education and sophistication; his business experience; and his "personal financial structure." *Id.* at 762 (internal quotation omitted). Records are adequate if they "permit the court and creditors to trace the debtor's financial dealings." *Neugebauer v. Senese (In re Senese)*, 245 B.R. 565, 576 (Bankr. N.D. Ill. 2000). If the Trustee can establish inadequacy of the Debtor's records, then the burden shifts to the Debtor to show that his failure to keep or preserve records was "justified under all of the circumstances of the case." *See* 11 U.S.C. § 727(a)(3); *see also Costello*, 299 B.R. at 897.

9

The Court acknowledges that § 727(a)(3) is generally not used to bar the discharge of "an ordinary consumer debtor." *Hansen*, 325 B.R. at 762. Thus, in most cases, "holes in a consumer debtor's financial records will not be enough to invoke section 727(a)(3)." *Id.* This case does not, however, involve an ordinary consumer debtor, nor are the gaps in the Debtor's financial records merely "holes." Rather, the Debtor here has engaged in real estate development, is a licensed real estate broker, and has operated for over twenty years his own ticket brokerage business, a company that is regulated by the State of Illinois. Thus, it is not unreasonable to expect and require the Debtor to maintain adequate records reflecting his financial affairs.

After several requests from the Trustee, the Debtor produced some records in connection with Best Seats, including tax documents, credit card statements, annual reports, bank statements, an inventory list, profit-and-loss statements, schedules of receivables and payables, and QuickBooks printouts. (Debtor Exs. 6-25, 28-30, 33-39.) Most of these exhibits, however, were not examined or considered in any detail during the trial that took place in January 2018, nor were they admitted into evidence. Rather, the Debtor submitted the exhibits to the Court with the pretrial materials, and they were discussed only generally at trial. (*See* Tr. 81:25-96:19.) Moreover, the records produced were incomplete, lacked detail, and, except for the one documenting the $12,000 wire transfer, did not account for the $202,000 in cash allegedly loaned to the Debtor by Auriemma.

In his defense, the Debtor testified that his ticket brokerage company is primarily a cash business. However, he also testified about various records that are generated for purchases or sales through Best Seats. (Tr. 180:15-183:8.) The Debtor further testified that the cash allegedly borrowed from Auriemma was paid to many third parties, including contractors who were remodeling the hot dog stand, sellers and purchasers of tickets through Best Seats, real estate taxing

10

authorities, attorneys, and others. Thus, there were potentially dozens of sources of information and documentation that could have established the expenditure of the funds that the Debtor claims he borrowed from Auriemma. Although the Trustee requested production of such information, the Debtor produced absolutely no documentation evidencing the expenditures. Likewise, although the Debtor testified that Auriemma was a sophisticated businessman who owned Nationwide, a licensed mortgage brokerage firm, the Debtor produced no documents reflecting the receipt or disposition of any funds from Auriemma or Nationwide, except for the one wire transfer.

The Debtor tried to explain his lack of records in connection with both Best Seats and the disposition of the alleged Auriemma funds by claiming that his Home had been flooded in 2014. (Tr. 165:4-168:23.) According to the Debtor, he operated his ticket brokerage business out of his Home, and a flood in the basement where he kept some of his records caused them to be destroyed. (*Id.*) In support of this contention, the Debtor produced a letter from State Farm to Best Seats; however, the letter, dated March 15, 2013, referred to a February 3, 2013 date of loss, not a 2014 occurrence. (Tr. 166:19-169:11; Debtor Ex. 5.) Moreover, the letter refers only to a claim for lost jewelry, noting that the jewelry was not covered because "it d[id] not meet the insuring agreement of business personal property." (Debtor Ex. 5.)

The other problem with the Debtor's explanation for his failure to keep or preserve records is that only one of the alleged Auriemma cash loans at issue was made prior to the claimed flood loss date of February 2013. According to the Debtor, the rest of the loans were all obtained after the date of the alleged flood. Further, by the Debtor's own testimony, the one alleged loan that was extended in 2012, purportedly for the remodeling of the Debtor's hot dog stand, was entirely a cash transaction for which there were no records. Thus, the Debtor's explanation for his inability to maintain or produce business records was completely lacking in credibility.

The Court and creditors are not obligated to reconstruct the Debtor's financial situation and are not required to take his word for his financial affairs in the absence of adequate records. Nor does the Trustee need to issue subpoenas or otherwise search for records from third parties in order to recreate a picture of the Debtor's financial condition or support his incredible justification for failing to keep records. *See Union Planters Bank*, 283 F.3d at 899.

The Trustee bears only the burden of demonstrating the inadequacy of the Debtor's records, *see Costello*, 299 B.R. at 897, and he has sufficiently satisfied this burden without difficulty. Thus, the Court finds that the Debtor has failed to keep or preserve adequate recorded information from which his true financial condition or business transactions might be ascertained with any kind of accuracy. The Court further finds that the Debtor has not offered any reasonable justification for his failure to maintain adequate financial records. Accordingly, the Debtor's failure to preserve or produce adequate records supports denial of his discharge under § 727(a)(3).

### Section 727(a)(5)

Section 727(a)(5) provides that a debtor is entitled to a discharge unless he "has failed to explain satisfactorily, before determination of denial of discharge . . . , any loss of assets or deficiency of assets to meet the debtor's liabilities[.]" 11 U.S.C. § 727(a)(5). This provision compels debtors to be forthcoming with information regarding any disposition of substantial assets at the risk of being denied a discharge. *See Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 740 (Bankr. N.D. Ill. 2004).

There are two stages of proof required under § 727(a)(5). *Structured Asset Servs., L.L.C. v. Self (In re Self)*, 325 B.R. 224, 250 (Bankr. N.D. Ill. 2005). First, the party objecting to discharge must demonstrate that the debtor at one time owned substantial and identifiable assets that are no longer available for his creditors. *Id.* Second, if the party objecting to discharge satisfies that

burden, the debtor must then establish a satisfactory explanation for the disposition of the assets. *Id.*

The court has broad discretion to determine whether a debtor has provided an explanation that is "satisfactory" such that his discharge should not be denied under § 727(a)(5). *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 886 (7th Cir. 1983). The debtor's account of the assets need not be "far-reaching and comprehensive" but must consist of more than a "vague, indefinite, and uncorroborated hodgepodge of financial transactions" and must be explained in good faith. *Olbur*, 314 B.R. at 741 (internal quotations omitted). While a denial of discharge under § 727(a)(5) does not necessarily depend on whether a debtor is lying about his financial past, a determination of whether the debtor's explanation is credible is a question of fact. *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996); *Ill. ex rel. Ryan v. Volpert (In re Volpert)*, 175 B.R. 247, 264 (Bankr. N.D. Ill. 1994).

In this case, on April 21, 2015, the Debtor had in his Home at least $182,000 in equity that was available for his creditors. Less than three months later, on July 2, 2015, that equity was no longer available after the Debtor executed mortgages and security agreements in favor of Nationwide and/or Auriemma in the face amount of $375,000. In attempting to provide an explanation for the loss or disposition of that equity, the Debtor said that he needed to execute the financial documents, thereby losing the equity, in order to secure previously unsecured debts of $240,000 owed to Auriemma, as well as to obtain additional financing.

The Debtor's explanation is troubling and unsubstantiated. According to his testimony, the loan transactions were entirely in cash, and the Debtor produced no evidence showing the receipt of the funds or, for that matter, their subsequent use. As discussed above, the Debtor used the cash that was purportedly borrowed from Auriemma to pay various third parties, and, thus, any

13

number of records documenting the use of the money could have been produced, including real estate tax bills and receipts, invoices for attorney's fees, credit card statements, and documents in connection with purchases and sales through the Debtor's ticket brokerage business. Despite these possible sources of documentation, the Debtor provided no records evidencing either the receipt of the $240,000 or the disposition of the funds.

As a result, the Debtor has failed to provide a satisfactory explanation for the disposition of both the $182,000 of equity in his Home and the $240,000 in loan proceeds from Auriemma. Thus, the Debtor's discharge must be denied under § 727(a)(5).

### Section 727(a)(2)(A)

Finally, a debtor's discharge may be denied under § 727(a)(2)(A) when the debtor, "with intent to hinder, delay, or defraud a creditor . . . , has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition[.]" 11 U.S.C. § 727(a)(2)(A). The purpose of the statutory exception is to prevent the discharge of a debtor who tries to avoid paying his creditors by concealing or otherwise disposing of his assets. *See Blomberg v. Riley (In re Riley)*, 351 B.R. 662, 670 (Bankr. E.D. Wis. 2006). To prevail under § 727(a)(2), a plaintiff must establish two elements: "an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor)." *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002) (internal quotation omitted), *aff'd on other grounds sub nom. Kontrick v. Ryan*, 540 U.S. 443 (2004); *Barber v. Herold (In re Herold)*, Bankr. No. 07-81575, Adv. No. 07-8139, 2008 WL 4855646, at *3 (Bankr. C.D. Ill. Nov. 10, 2008) (citing *Kontrick*).

The Code defines "transfer," in relevant part, as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . property[] or . . . an

interest in property." 11 U.S.C. § 101(54)(D). Concealment, for purposes of § 727(a)(2), consists of "failing or refusing to divulge information to which creditors [are] entitled." *Neary v. Mosher (In re Mosher)*, 417 B.R. 772, 784 (Bankr. N.D. Ill. 2009) (internal quotation omitted).

As for intent, § 727(a)(2) requires proof of actual intent. *McWilliams*, 284 F.3d at 790. Because a debtor is unlikely to admit his fraudulent intent, however, a finding of actual intent may be inferred from the surrounding circumstances. *Id.* at 790-91; *In re Snyder*, 152 F.3d 596, 601 (7th Cir. 1998); *In re Krehl*, 86 F.3d 737, 743 (7th Cir. 1996). Certain factors, or "badges" of fraud, "may warrant the inference." *Olbur*, 314 B.R. at 744. These include the debtor's retention of possession, benefit, or use of the property; the debtor's financial condition; a lack of consideration for the transfer; a familial or close relationship between the parties; and the chronology of the events in question. *McWilliams*, 284 F.3d at 791; *Olbur*, 314 B.R. at 744. Fraudulent intent may also be established by demonstrating that the debtor acted with "reckless disregard," or "the state of mind present when a debtor does not care about the truth or falsity" of a statement or situation. *Neary v. Stamat (In re Stamat)*, 395 B.R. 59, 71 (Bankr. N.D. Ill. 2008), *aff'd*, No. 08 C 6543, 2009 WL 2916834 (N.D. Ill. Sept. 2, 2009), *aff'd*, 635 F.3d 974 (7th Cir. 2011). In deciding whether a debtor has acted with intent to defraud for purposes of § 727, the Court should consider the Debtor's "whole pattern of conduct." *Richardson v. Clarke (In re Clarke)*, 332 B.R. 865, 870 (Bankr. C.D. Ill. 2005) (internal quotation omitted).

In this case, as outlined above, in April 2015, the Debtor had at least $182,000 in Home equity that could have been available to pay his creditors. In July 2015, with an obligation of at least $80,000 owing to FirstMerit Bank in connection with the Cortland transaction, the Debtor executed a junior mortgage in the amount of $375,000 in favor of his friend Auriemma both to secure previously unsecured loans from Auriemma and to obtain additional cash from him, all

totaling $240,000. Despite the Debtor's claim that he was trying to settle with FirstMerit Bank (and that he would have done so had the Bank been more reasonable), it is beyond dispute that he executed the junior mortgage at a time when he owed a substantial debt to the Bank.

Notwithstanding the foregoing, the Debtor testified that the execution of the junior mortgage was not done with intent to hinder, delay, or defraud creditors. Rather, the Debtor said, he was simply obtaining an additional cash "advance" and also fulfilling a pledge to Auriemma to secure otherwise unsecured loans because equity in his Home was now available.

Based on this transaction, the Court finds that the Debtor transferred or removed the equity in his Home within one year of the filing of his bankruptcy petition for purposes of § 727(a)(2)(A). In doing so, he certainly preferred Auriemma over his other creditors, including FirstMerit Bank. Whether that action—combined with the Debtor's "whole pattern of conduct"—establishes that he acted with fraudulent intent with regard to his other creditors, however, is more difficult to conclude. Although the Debtor had a close relationship with Auriemma, the evidence does not sufficiently establish the other badges of fraud to permit the Court to find that the Debtor actually intended to defraud his creditors. As such, the Court does not find in favor of the Trustee on Count I of the complaint, and that count will be dismissed.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of the Trustee and against the Debtor on Counts II and III of the adversary complaint and holds that the Debtor is not entitled to a discharge under §§ 727(a)(3) and (a)(5). As such, the Debtor will be denied a discharge under those counts. The Court further finds that the Trustee has failed to meet his burden under § 727(a)(2)(A) in Count I of the complaint. Accordingly, that count will be dismissed. A separate order will be entered consistent with this Memorandum Opinion.

Dated: **August 7, 2018**  **ENTERED:**

_Janet S. Baer_
Janet S. Baer
United States Bankruptcy Judge